*100 Congress frequently passes statutes that either permit or require agencies to assess monetary penalties against parties who fail to comply with the law. After the bill is passed, however, the initial dollar amount of the penalty often remains unchanged. Due to inflation, this stasis in the law has the practical effect of decreasing the value of the penalty over time.
In 2015, Congress passed a law requiring federal agencies to adjust their civil penalties to account for inflation, so that those imposed by agencies today have approximately the same value as they did at the time the penalties were initially created by Congress. Federal Civil Penalties Inflation Adjustment Act Improvement Act of 2015 (the "Improvements Act"), Bipartisan Budget Act of 2015, Pub. L. 114-74, § 701, 129 Stat. 584, 599 (2015) (codified at 28 U.S.C. § 2461 note). This Act applied to all executive agencies across the federal government. The Act provided a clear method for agencies to use when calculating the new dollar amounts and gave them approximately six months to issue interim final rules announcing the new penalties.
We are now asked to determine whether the National Highway Traffic Safety Administration ("NHTSA") acted unlawfully when it published a rule indefinitely delaying the effective date of the new civil penalty promulgated by the agency several months prior. The delayed rule would have increased civil penalties for violations of corporate average fuel economy ("CAFE") standards. Petitioners in this action (the "Petitioners") claim NHTSA exceeded its statutory authority in indefinitely delaying a rule implemented pursuant to the clear Congressional directive in the Improvements Act. Petitioners also claim that the agency violated the requirements of the Administrative Procedures Act ("APA").
We agree with Petitioners on both issues and conclude NHTSA's actions were unlawful. On April 23, 2018, we issued an Order vacating the rule and granting the petition for review, and indicated an opinion would follow in due course.
BACKGROUND
I. Energy Policy and Conservation Act
In 1975, Congress passed the Energy Policy and Conservation Act ("EPCA").
*101 The Act was passed in the immediate wake of the 1973-74 oil crisis and its purpose was to reduce the likelihood of another severe energy crisis through the creation of programs focused on energy regulation, energy conservation, and, most relevant to this case, "improved energy efficiency of motor vehicles, major appliances, and certain other consumer products." 42 U.S.C. § 6201(5). The focus of EPCA's effort to improve the energy efficiency of cars was the implementation of the CAFE standards for vehicles, which established fuel economy targets for different categories of vehicles, measured in miles per gallon. EPCA directs the Secretary of Transportation to "prescribe [the CAFE standards] by regulation" "[a]t least 18 months before the beginning of each model year." 49 U.S.C. § 32902(a). Further, "[e]ach standard shall be the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year." Id . The Secretary of Transportation has delegated these responsibilities to the NHTSA Administrator. 49 CFR § 1.95(a).
Part of EPCA's statutory scheme includes civil penalties for "a manufacturer that violates a standard prescribed for a model year under section 32902 of this title [the CAFE standards]." 49 U.S.C. § 32912(b). The total civil penalty is calculated by multiplying the civil penalty rate by the number of tenths of mile per gallon by which the car's fuel efficiency fell below the prescribed standard. Id . That number is then multiplied by the number of failing automobiles produced by the manufacturer, less any credits received by the manufacturer for exceeding the standards in prior years.[1] Id .
When EPCA was passed in 1975, the CAFE penalty was set at $5.00 per tenth of an mpg. Pub. L. No. 94-163, 508(b)(1)(A), 89 Stat. 871, 913, ("Any manufacturer whom the Secretary determines under subsection (a) to have violated a provision of section 507(1), shall be liable to the United States for a civil penalty equal to (i) $5 for each tenth of a mile per gallon by which the average fuel economy of the passenger automobiles manufactured by such manufacturer during such model year is exceeded by the applicable average fuel economy standard established under section 502(a) and (c), multiplied by (ii) the total number of passenger automobiles manufactured by such manufacturer during such model year."); see also 49 U.S.C. § 32912(b).
II. Inflation Adjustment Acts and Rulemaking
Between 1975 and 1997, the penalty was never increased from $5. In 1997, a 10 percent adjustment raised the penalty to $5.50, and the penalty remained at that amount until 2016, when NHTSA published an interim final rule raising the penalty to $14 per tenth of an mpg. Civil Penalties, 81 Fed. Reg. 43,524 (July 5, 2016). The 2016 adjustment was driven by passage of the Improvements Act, which "require[d] agencies to make an initial catch up adjustment to the civil monetary penalties they administer through an interim final rule and then to make subsequent annual adjustments for inflation." Id . NHTSA explained that the Improvements Act established the formula it used to set the new penalty, which was accordingly increased to $14 per tenth of an mpg. Id . at 43,525 -26. Because the new penalty was issued as an interim final rule (per the statutory *102 directive), NHTSA set an effective date of August 4, 2016, but continued to accept petitions for reconsideration until August 19, 2016. Id . at 43,524.
On August 1, 2016, the Alliance of Automobile Manufacturers and the Association of Global Automakers (who are intervenors in this action) petitioned NHTSA for partial reconsideration of the interim final rule. On August 3, 2016, Jaguar Land Rover North America also petitioned for reconsideration of the interim final rule. These industry petitioners conceded that "NHTSA was obligated to take some action in response to the Improvements Act" and "that NHTSA [was] not empowered to exempt the CAFE program from this directive." Joint App'x at 31. The industry petitioners instead raised concerns about the method used to calculate the new penalty and its retroactive application.
On December 28, 2016, NHTSA published the final rule in the Federal Register, which modified the prior interim final rule in response to concerns raised by the industry petitioners in their requests for reconsideration. Civil Penalties, 81 Fed. Reg. 95,489 (Dec. 28, 2016). Specifically, NHTSA determined that it would not apply the new penalty rates retroactively and would instead delay the implementation of the penalty rate until model year 2019. Id . at 95,491. The final rule explained:
NHTSA believes this approach appropriately harmonizes the two congressional directives of adjusting civil penalties to account for inflation and maintaining attribute-based, consumer-demand-focused standards, applied in the context of the presumption against retroactive application of statutes. This decision increases civil penalties starting with the model year that manufacturers, in this particular instance, are reasonably able to design and produce vehicles in response to the increased penalties.
Id . at 95,491 (internal citation omitted). The final rule included an effective date of January 27, 2017. Id . at 95,489.
III. Subsequent Agency Actions
On January 20, 2017, Reince Priebus (at the time, the Assistant to the President and Chief of Staff), issued a Memorandum for the Heads of Executive Departments and Agencies, regarding a "regulatory freeze pending review." Joint App'x at 55. The memo directed that,
With respect to regulations that have been published in the OFR but have not taken effect, as permitted by applicable law, temporarily postpone their effective date for 60 days from the date of this memorandum, subject to the exceptions described in paragraph 1 [regarding emergencies and other "urgent circumstances"], for the purpose of reviewing questions of fact, law, and policy they raise. Where appropriate and as permitted by applicable law, you should consider proposing for notice and comment a rule to delay the effective date for regulations beyond that 60-day period.
Id . Accordingly, on January 30, 2017, NHTSA published a final rule in the Federal Register that "temporarily delay[ed] for 60 days the effective date of the rule entitled 'Civil Penalties' published in the Federal Register on December 28, 2016." Civil Penalties, 82 Fed. Reg. 8,694 (Jan. 30, 2017). On March 28, 2017, NHTSA published a new Final Rule delaying the effective date of the December 28, 2016 final rule by an additional 90 days. Civil Penalties, 82 Fed. Reg. 15,302 (Mar. 28, 2017). On June 27, 2017, NHTSA yet again delayed the effective date of the rule by an additional 14 days. Civil Penalties, 82 Fed. Reg. 29,009 (June 27, 2017).
*103 On July 12, 2017, NHTSA published a final rule in the Federal Register that is the subject of the current petitions for review. This rule, which we refer to as the "Suspension Rule," stated that, "As of July 7, 2017, the effective date of the final rule published in the Federal Register on December 28, 2016, at 81 FR 95489, is delayed indefinitely pending reconsideration." 82 Fed. Reg. 32,139 (July 12, 2017). NHTSA explained:
NHTSA is now reconsidering the final rule because the final rule did not give adequate consideration to all of the relevant issues, including the potential economic consequences of increasing CAFE penalties by potentially $1 billion per year, as estimated in the Industry Petition. Thus, in a separate document published in this Federal Register, NHTSA is seeking comment on whether $14 per tenth of an mpg is the appropriate penalty level for civil penalties for violations of CAFE standards given the requirements of the Inflation Adjustment Act and the Energy Policy and Conservation Act (EPCA) of 1975, which authorizes civil penalties for violations of CAFE standards. Because NHTSA is reconsidering the final rule, NHTSA is delaying the effective date pending reconsideration.
Id . at 32,139 -40. The notice of reconsideration and request for comments was published in the Federal Register immediately after the notice of indefinite delay. Civil Penalties, 82 Fed. Reg. 32,140, 32,140 -45 (July 12, 2017).
Petitioners consist of several states (the "State Petitioners") and various environmental organizations (the "Environmental Petitioners"). On September 7, 2017, the environmental petitioners sought review of the Suspension Rule on the ground that it had been unlawfully promulgated. The next day, the state petitioners also sought review.
REVIEWABILITY
Before we consider the merits of the challenges to NHTSA's action, we consider whether State Petitioners and Environmental Petitioners have standing and whether their petitions were timely.
I. Standing
Whether a plaintiff possesses standing to sue under Article III "is the threshold question in every federal case, determining the power of the court to entertain the suit." Warth v. Seldin , 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). To establish Article III standing, a plaintiff must demonstrate: (1) injury-in-fact, which means "an actual or imminent" and "concrete and particularized" harm to a "legally protected interest"; (2) causation of the injury, which means that the injury is "fairly traceable" to the challenged action of the defendant; and (3) redressability, which means that it is "likely," not speculative, that a favorable decision by a court will redress the injury. Lujan v. Defenders of Wildlife , 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal punctuation omitted).
As to the legislative authorization to petition for review, Petitioners fall within the relevant judicial review provision of EPCA, which permits "a person" to petition for review. 49 U.S.C. § 32909(a). A separate provision of that Act defines "person" to include "State." 42 U.S.C. § 6202(2). NHTSA does not dispute that EPCA's statutory language and framework suggest that states are "persons" for purposes of judicial review under EPCA.
As to the State Petitioners, the Supreme Court has specifically recognized states' standing to sue in cases involving *104 environmental damage, observing that a state's "well-founded desire to preserve its sovereign territory" supports standing in cases implicating environmental harms. Mass. v. EPA , 549 U.S. 497, 519, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). That a state's own territory is the "territory alleged to be affected" by the challenged action "reinforces the conclusion that its stake in the outcome of this case is sufficiently concrete to warrant the exercise of federal judicial power." Id.; see also Conn. v. Am. Elec. Power Co., Inc. , 582 F.3d 309, 340-42 (2d Cir. 2009), rev'd on other grounds , 564 U.S. 410, 131 S.Ct. 2527, 180 L.Ed.2d 435 (2011). These principles-and the declarations submitted by State Petitioners-lead us to conclude that the State Petitioners have suffered an injury-in-fact.
As to the Environmental Petitioners, an organization "has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc. , 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).
Members of the environmental organizations have submitted declarations indicating that they live in polluted areas and along roadways and have suffered respiratory ailments. These are petitioners who, as we have noted, have "no choice but to breathe the air where [they] live[ ] and work[ ]-air that will undoubtedly contain increased levels" of pollutants from automobile exhaust. LaFleur v. Whitman , 300 F.3d 256, 270 (2d Cir. 2002) (holding that a petitioner who lived near the source of air pollution possessed standing); see also, e.g. , N.Y. Pub. Interest Research Grp. v. Whitman , 321 F.3d 316, 325-26 (2d Cir. 2003). These well-documented dangers associated with automobile emissions lead us to conclude that the Environmental Petitioners here have suffered an injury-in-fact.
As to causation and redressability, NHTSA argues that the connection between potential industry compliance and the agency's imposition of coercive penalties intended to induce compliance is too indirect to establish causation and redressability. We are not persuaded. As the caselaw recognizes, it is well-settled that "[f]or standing purposes, petitioners need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test. This is true even in cases where the injury hinges on the reactions of the third parties, here the auto manufacturers, to the agency's conduct." Competitive Enter. Inst. v. NHTSA , 901 F.2d 107, 113 (D.C. Cir. 1990) (citations omitted). In this case, the required nexus between inappropriately low penalties and harm to Petitioners is established by the agency's own pronouncements and a robust body of caselaw recognizes the connection. The record establishes that Petitioners' harms are caused by the agency's indefinite suspension of a meaningful and up-to-date penalty and would be redressed by the new regime of significantly increased penalties, which Congress mandated. The Suspension Rule indefinitely removed the increased fine in favor of the substantially lesser, outdated penalty that Congress, as we discuss below, determined was inadequate. Indeed, the penalty had been increased significantly-by 150 percent, from $5.50 to $14. The removal of this increased penalty easily satisfies the standing elements of causation and redressability. "[T]he notion that financial [incentives] deter environmental misconduct is hardly novel."
*105 In re Idaho Conservation League , 811 F.3d 502, 510 (D.C. Cir. 2016). Not only do "[c]ommon sense and basic economics," Carpenters Indus. Council v. Zinke , 854 F.3d 1, 6 (D.C. Cir. 2017), tell us that the increased cost of unlawful conduct will make that conduct less common, but, by automakers' own admission, the increased penalty has the potential to affect automakers' business decisions and compliance approaches, both with respect to the market for credits automakers can use in lieu of compliance and to "changes to some design and fleet mix." Intervenors' (AGA) Br. at 53. Tellingly, NHTSA itself has concluded that emissions reductions from compliance with higher fuel economy standards would "result in significant declines in the adverse health effects that result from population exposure to these pollutants." 2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions and Corporate Average Fuel Economy Standards, 77 Fed. Reg. 63,062, 63,062 (Oct. 15, 2012).
For these reasons, we conclude that Petitioners have standing.
II. Timeliness
NHTSA argues that the petition is untimely and therefore not subject to review in this Court. We disagree. Judicial review here is authorized by Section 32909 of EPCA, which provides that a petition for review "must be filed not later than 59 days after the regulation is prescribed." 49 U.S.C. § 32909(b). NHTSA argues that this 59-day time period begins to run when the agency delivers an agency action to the Office of the Federal Register and the action is made available for public inspection. That delivery occurred on July 7, 2017, and, according to NHTSA, made Petitioners' September 7 and 8, 2017, filings untimely by three or four days. Petitioners, on the other hand, contend that the time period begins to run when the rule is published in the Federal Register, which occurred on July 12, 2017, and which would make the petitions timely by one or two days. We conclude that the petitions were timely filed.
In reaching this conclusion, we do not plow new ground. We have already determined equivalent language in another judicial review provision of EPCA to peg the time for seeking review to the time when the rule is published in the Federal Register. In Natural Resources Defense Council v. Abraham , 355 F.3d 179 (2d Cir. 2004), we interpreted an EPCA judicial review provision that provided "[a]ny person who will be adversely affected by a rule prescribed ... may, at any time within 60 days after the date on which such rule is prescribed, file a petition ... for judicial review." 42 U.S.C. § 6306(b)(1). We held that this language refers to publication in the Federal Register "for purposes of filing a challenge in the court of appeals." Abraham , 355 F.3d at 196 n.8. We noted that in the consumer appliance provisions of EPCA, the statute treats the words "publish" and "prescribe" as "interchangeable." Id. at 196. This was because, in the statutory provision at issue in Abraham , 42 U.S.C. § 6295(p), "publication in the Federal Register ... is the culminating event in the rulemaking process." Abraham , 355 F.3d at 196 (citing 42 U.S.C. § 6295(p) ) (emphasis in original). That provision required the agency to publish a notice of proposed rulemaking, and then, "after a period of notice and comment, 'a final rule prescribing an amended ... conservation standard or prescribing no amended standard ... shall be published as soon as is practicable, but not less than 90 days, after the publication of the proposed rule in the Federal Register." Id. (citing 42 U.S.C. § 6295(p)(4) ). Those principles apply to the comparable scheme here. For example, 49 U.S.C. § 32912(c) provides that to "prescribe" a higher civil *106 penalty, the agency "shall publish" a proposed regulation and provide at least 45 days for comments and public hearings, at which point the agency "shall publish a regulation prescribed under this subsection in the Federal Register," along with various required findings. Id. We see no basis to depart from our holding in Abraham that equivalent language in a separate section of the Act treated publication in the Federal Register as "the culminating event in the rulemaking process," and, therefore, as the controlling point for determining when a challenge must be filed in the court of appeals. Abraham , 355 F.3d at 196 & n.8.[2]
The most natural meaning of the word "prescribe," as it is used within administrative law and the relevant judicial review provision, supports this outcome. The word "prescribe" as used in the context of a law or regulation means "to establish authoritatively (as a rule or guideline)." See Black's Law Dictionary (10th ed. 2014). It is a basic tenet of administrative law, set out by the APA, that a substantive regulation does not have legal effect-that is, it has not been "establish[ed] authoritatively"-until it has been published in the Federal Register.[3] See 5 U.S.C. § 552(a) ; see also, e.g. , NRDC v. EPA , 559 F.3d 561, 565 (D.C. Cir. 2009) ("Agencies must publish substantive rules in the Federal Register to give them effect."); see also Morton v. Ruiz , 415 U.S. 199, 232-35, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). In other words, a regulation is not "prescribed" until it has legal effect, and it does not have legal effect until it is published in the Federal Register.
This reading aligns with the requirement in Section 32909 that a person must be "adversely affected" to seek review of a regulation. Because it is only through publication in the Federal Register that an agency's action can take legal effect, we believe Congress intended for publication to be the operative event. In our view, it would be implausible for Congress to enact a provision pegging the time for seeking judicial review by a person "adversely affected" to begin before the regulation is capable of causing someone to be "adversely affected."
In any event, contrary to NHTSA's contention, the 59-day deadline *107 is not jurisdictional. The Supreme Court has made clear that, for a provision to define a federal court's jurisdiction, there must be a "clear statement" from Congress to that effect. Sebelius v. Auburn Regional Med. Ctr. , 568 U.S. 145, 153, 133 S.Ct. 817, 184 L.Ed.2d 627 (2013). Most time bars are nonjurisdictional and, "absent such a clear statement ... courts should treat the restriction as nonjurisdictional[.]" Id . (quotation marks omitted). The Supreme Court has further instructed that, "in applying that clear statement rule, we have made plain that most time bars are nonjurisdictional. Time and again, we have described filing deadlines as 'quintessential claim-processing rules,' which 'seek to promote the orderly progress of litigation,' but do not deprive a court of authority to hear a case." United States v. Kwai Fun Wong , --- U.S. ----, 135 S.Ct. 1625, 1632, 191 L.Ed.2d 533 (2015) (internal citations omitted) (quoting Henderson v. Shinseki , 562 U.S. 428, 435, 131 S.Ct. 1197, 179 L.Ed.2d 159 (2011) ).[4]
Section 32909 contains no indication, much less a "clear statement," that its filing deadline and venue requirements were meant to be jurisdictional. Neither its text nor context nor legislative history indicate that Section 32909 is "a rare statute of limitations that can deprive a court of jurisdiction," Kwai Fun Wong , 135 S.Ct. at 1632. Section 32909 is instead a typical claim-processing provision, empowering adversely affected persons to seek judicial review and setting out certain requirements such persons must follow when doing so.
Consequently, Section 32909 is subject to equitable tolling. Even if NHTSA were correct that the relevant event was the delivery of notice of its action to the Office of the Federal Register and the making of it available to public inspection (which it is not) as opposed to publication in the Federal Register, dismissal would not be appropriate. Petitioners, at a minimum, were entitled to rely on this court's decision in Abraham , which, as we have seen, held that the deadline for filing a petition for review under a similarly worded provision was triggered by publication in the Federal Register. So, while we hold that Section 32909 's filing deadline is triggered by publication of the agency action in the Federal Register, even if it were not, we conclude that equitable tolling is available to render the petitions timely.
Accordingly, we conclude that Petitioners possess standing to bring this case and that the petitions are reviewable.
DISCUSSION
The APA directs courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory ... authority," id . § 706(2)(C), or "without observance of procedure as required by law," id . § 706(2)(D). We conclude NHTSA exceeded its statutory authority *108 in indefinitely delaying the Civil Penalties Rule and failed to follow the requirements of the APA when it did so.[5]
I. Statutory Authority
It is well settled that an agency may only act within the authority granted to it by statute. See, e.g. , Abraham , 355 F.3d at 202 (discussing the "well-established principle" that the boundaries of an agency's authority are exclusively drawn by Congress). This principle is a recognition of the nature of an administrative agency as a "creature of statute, having no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress." Atlantic City Elec. Co. v. FERC , 295 F.3d 1, 8 (D.C. Cir. 2002) (quoting Michigan v. EPA , 268 F.3d 1075, 1081 (D.C. Cir. 2001) ) (internal quotation marks omitted). In reviewing the scope of an agency's authority to act, "the question ... is always whether the agency has gone beyond what Congress has permitted it to do." City of Arlington v. FCC , 569 U.S. 290, 297-98, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013). Accordingly, we examine the "plain terms" and "core purposes" of the Improvements Act to determine whether the Act authorized NHTSA to publish the Suspension Rule.[6] See FERC v. Elec. Power Supply Ass'n , --- U.S. ----, 136 S.Ct. 760, 773, 193 L.Ed.2d 661 (2016). We conclude that the Improvements Act did not grant NHTSA that authority.
A. Plain Terms of the Improvements Act
The text of the Improvements Act requires agencies across the federal government to adjust civil penalties on a set schedule using a set formula:
(a) In General.-Not later than July 1, 2016, and not later than January 15 of every year thereafter , and subject to subsections (c) and (d), the head of each agency shall -
(1) in accordance with subsection (b), adjust each civil monetary penalty provided by law within the jurisdiction of the Federal agency, except for any penalty (including any addition to tax and additional amount) under the Internal Revenue Code of 1986 [ 26 U.S.C. 1 et seq. ] or the Tariff Act of 1930 [ 19 U.S.C. 1202 et seq. ], by the inflation adjustment described under section 5 of this Act; and (2) publish each such adjustment in the Federal Register.
(b) Procedures for Adjustments.-
(1) Catch up adjustment.-For the first adjustment made under subsection (a) after the date of enactment of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 [Nov. 2, 2015]-
(A) the head of an agency shall adjust civil monetary penalties through an interim final rulemaking; and
(B) the adjustment shall take effect not later than August 1, 2016 .
*109 (2) Subsequent adjustments.-
For the second adjustment made under subsection (a) after the date of enactment of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, and each adjustment thereafter, the head of an agency shall adjust civil monetary penalties and shall make the adjustment notwithstanding section 553 of title 5, United States Code.
28 U.S.C. § 2461 note § 4 (emphases added). The deadlines for adjustments are clear and mandatory. The Improvements Act contains an exception to its directive, but the exception regards the amount of the initial catch-up adjustment, not its timing.[7]
Given Congress's determination to ensure that civil penalties retain their value over time through regular inflationary adjustments, as reflected in this "highly circumscribed schedule" for the penalty increases Congress imposed, NRDC v. Reilly , 976 F.2d 36, 41 (D.C. Cir. 1992), we conclude that the statute does not authorize NHTSA to indefinitely delay implementation of these penalty increases "[i]n the face of such a clear statutory command," id . Although Congress preserved in the statute a narrow window of discretion for agencies regarding the amount of the initial catch-up adjustment, it afforded no such discretion regarding the timing of the adjustments.
B. Core Purposes of the Improvements Act
The baseline premise of the Improvements Act is that civil penalties had lost value over time because they had not been regularly updated to keep pace with inflation. 28 U.S.C. § 2461 note § 2. Specifically, the Act explained:
Congress finds that
(1) the power of Federal agencies to impose civil monetary penalties for violations of Federal law and regulations plays an important role in deterring violations and furthering the policy goals embodied in such laws and regulations;
(2) the impact of many civil monetary penalties has been and is diminished due to the effect of inflation;
(3) by reducing the impact of civil monetary penalties, inflation has weakened the deterrent effect of such penalties; and
(4) the Federal Government does not maintain comprehensive, detailed accounting of the efforts of Federal agencies to assess and collect civil monetary penalties.
28 U.S.C. § 2461 note § 2(a). A primary purpose of the Act was to "allow for regular adjustment for inflation of civil monetary penalties" and to "maintain the deterrent effect of civil monetary penalties and promote compliance with the law," id . § 2(b). The purpose of the Act is simply *110 incompatible with the notion of indefinite delay, given that the primary objective was to correct for decades of inaction.
The legislative history of the Improvements Act reinforces the purposes articulated in the statute. The Improvements Act is an amendment to a law originally passed nearly 30 years ago and represents the latest version of several congressional attempts to ensure that civil penalties keep pace with inflation. In 1990, Congress passed legislation designed to "establish a mechanism that shall (1) allow for regular adjustment for inflation of civil monetary penalties; (2) maintain the deterrent effect of civil monetary penalties and promote compliance with the law; and (3) improve the collection by the Federal Government of civil monetary penalties." Federal Civil Penalties Inflation Adjustment Act of 1990 ("Inflation Adjustment Act"), Pub. L. 101-410, § 2(b), 104 Stat. 890, 890 (1990) (current version at 28 U.S.C. § 2461 note § 2(b) ). The 1990 Act sought to achieve these goals by requiring the President to "submit a report on civil monetary penalty inflation adjustment" to specified Senate and House committees. Id . § 4. Rather than implementing actual adjustments to the penalties, the President was simply directed to identify existing penalties and make recommendations to Congress.[8] Id . § 6.
In 1996, Congress passed the Debt Collection Improvement Act of 1996. Appropriations Act, Pub. L. 104-134, § 31001, 110 Stat. 1321, 1321-373 (1996). The Act amended Section 4 of the Inflation Adjustment Act, so that rather than requiring reports from the President, agencies themselves were directed to "adjust each civil monetary penalty provided by law within the jurisdiction of the Federal agency" and to do so "by regulation." Id . § 31001(s)(1). The Act limited the initial adjustment to 10 percent of the then-current penalty. Id . § 31001(s)(2).
After the passage of the Debt Collection Improvement Act, NHTSA issued a final rule increasing the civil penalty for a violation of CAFE standards to $5.50, which was the maximum adjustment the agency could then make given the ten percent cap imposed by the Act. Civil Penalties, 62 Fed. Reg. 5,167, 5,168 (Feb. 4, 1997). NHTSA explained that the Debt Collection Improvement Act "requires Federal agencies to regularly adjust certain civil penalties for inflation," id . at 5,167, and that the $5.50 penalty was established "[p]ursuant to the inflation adjustment methodology included in the Debt Collection Act," id . at 5,168. The penalty remained set at $5.50 until the 2016 increase at issue in this proceeding.[9]
*111 In 2015, Congress made a renewed effort to tackle the recurring issue of stagnant civil monetary penalties with passage of the Improvements Act. Bipartisan Budget Act of 2015, Pub. L. 114-74, § 701, 129 Stat. 584, 599 (2015) (codified at 28 U.S.C. § 2461 note). The new Act made several key changes. Most notably, it removed the ten percent cap on penalties, deleted the rounding methodology that had kept penalties stagnant, and set firm dates by which agencies were required to implement the new penalties through interim final rulemaking. Id .
In reviewing the history of the Improvements Act, from the 1990 bill to the 2015 Improvements Act, we observe increasing intervention on the part of Congress regarding civil penalties. The evolution of this regulatory regime over the years-from data collection to mandated changes implemented on a strict timeline-is a powerful indication to us that Congress did not authorize NHTSA to publish the Suspension Rule. Indeed, permitting indefinite delay of the increased civil penalties mandated by the Improvements Act would "flout the ... core objects" of that Act. FERC , 136 S.Ct. at 781. We cannot read the Improvements Act to permit the very kind of indefinite delay that it was enacted to end.
C. NHTSA's Arguments
NHTSA does not argue that the Improvements Act explicitly granted it authority to indefinitely delay the increase, nor could it plausibly do so given the clear terms of the statute and its purpose. The agency instead advances several other theories regarding its authority to indefinitely delay the Civil Penalties Rule. Of course, our review is limited to the rationales offered by NHTSA at the time it published the Suspension Rule. See SEC v. Chenery Corp. , 318 U.S. 80, 87-88, 63 S.Ct. 454, 87 L.Ed. 626 (1943). We may only enter "a judgment upon the validity of the grounds upon which the [agency] itself based its action." Id . at 88, 63 S.Ct. 454.
When NHTSA published the Suspension Rule in the Federal Register, it offered three justifications for the rule: (1) the decision to reconsider the increased penalty required indefinite delay, (2) it was authorized by EPCA to implement CAFE standards and the delay is included in that authority, and (3) it possesses inherent authority to delay the effective date of the rule. 82 Fed. Reg. at 32,140. None of these arguments persuades us.
1. Reconsideration Requires Delay
The notice of the indefinite delay rule in the Federal Register states that "[b]ecause NHTSA is reconsidering the final rule, NHTSA is delaying the effective date pending reconsideration." 82 Fed. Reg. at 32,140. The need for delay pending reconsideration is the primary ground advanced by NHTSA in this proceeding, but NHTSA offers no authority-statutory or otherwise-for the proposition that an agency has authority to delay a rule because it is engaged in a separate process of reconsideration. NHTSA instead argues that delay pending reconsideration is authorized because that is what many other agencies do.
We take no position on whether the actions referred to by NHTSA involving different agencies operating under different statutory schemes and bound by different rules are lawful or not. NHTSA's argument on this point is essentially that there is a categorical authority for an agency to delay an effective date of an earlier rule pending reconsideration. We disagree. As the D.C. Circuit recently held, a decision to reconsider a rule does not simultaneously convey authority to indefinitely delay the existing rule pending that *112 reconsideration. See Clean Air Council , 862 F.3d at 9.
2. Authority under EPCA
NHTSA also argues that its authority to publish the Suspension Rule is that such authority inheres in its obligation to implement the CAFE standards. As NHTSA stated in enacting the indefinite delay, "[a] delay in the effective date is ... consistent with NHTSA's statutory authority to administer the CAFE standards program." 82 Fed. Reg. at 32,140. NHTSA does not, however, point us to any particular section of EPCA that supports this proposition.[10]
The civil penalty for violation of fuel economy standards is governed by 42 U.S.C. § 32912. This provision addresses rate setting and the implementation of civil penalties, as well as directions on how the Secretary of Transportation is permitted to spend the fees generated by the penalties. Id . Nothing in Section 32912 authorized the indefinite delay of a penalty increase required by the statute, either pending reconsideration or for any other reason.
The penalty increase is mandated by the Improvements Act, and applies to all agencies across the federal government. Nothing in EPCA contradicts or undermines that mandate. The goal of the Improvements Act was to increase compliance with all federal regulatory programs, not just the CAFE standards.[11] In implementing the Improvements Act, Congress articulated purposes that transcended the confines of any given agency's regulatory functions: promoting "compliance with the law" writ large, as well as improving "collection by the Federal Government of civil monetary penalties." 28 U.S.C. § 2461 note, § 2(b). EPCA does not contravene this government-wide policy. Nor does it confer authority upon NHTSA to delay this penalty as part of its responsibility for administering the fuel economy portions of that statute. NHTSA's arguments to the contrary are meritless.
3. Inherent Authority
In promulgating the Suspension Rule, NHTSA also stated that it possessed "inherent authority" to indefinitely delay the rule. 82 Fed. Reg. at 32,140. In Abraham , we considered an agency's claim that it possessed an "inherent power to reconsider final rules it has published in the Federal Register." 355 F.3d at 202. We rejected this contention "in light of the well-established principle that an agency literally has no power to act unless and until Congress confers power upon it." Id.
Given the clear Congressional directives in the Improvements Act, NHTSA was required to "point to something," Clean Air Council , 862 F.3d at 9, in either the Improvements Act or EPCA that granted *113 it authority to indefinitely delay the rule. Because it could not do so and because the text, purpose, and history of the Improvements Act are all unambiguous regarding the mandatory nature of the penalty deadlines, NHTSA's indefinite delay was issued "in excess of statutory ... authority," 5 U.S.C. § 706(2)(C).[12]
II. Administrative Procedure Act
We also conclude that NHTSA violated the APA by announcing the Suspension Rule without having first undertaken notice and comment rulemaking.
Under the APA, before promulgating a rule an agency must publish "[g]eneral notice of proposed rule making ... in the Federal Register," as well as "an opportunity to participate in the rule making through submission of written data, views, or arguments." See 5 U.S.C. § 553. These requirements apply with the same force when an agency seeks to delay or repeal a previously promulgated final rule. A basic principle of administrative law is that "an agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked." Clean Air Council , 862 F.3d at 9 (quoting Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan , 979 F.2d 227, 234 (D.C. Cir. 1992) ). Similarly an agency "may not alter such a rule without notice and comment," id . at 6 (brackets omitted), nor does the agency have any inherent power to stay a final rule, id. at 9. We reached the same conclusion in Abraham , where we noted that "altering the effective date of a duly promulgated standard could be, in substance, tantamount to an amendment or rescission of the standards." 355 F.3d at 194. A significant body of authority reinforces this proposition. See, e.g., Public Citizen v. Steed , 733 F.2d 93, 98 (D.C. Cir. 1984) ("In any event, an 'indefinite suspension' does not differ from a revocation simply because the agency chooses to label it a suspension ..."); Envt'l Def. Fund, Inc. v. EPA , 716 F.2d 915, 920 (D.C. Cir. 1983) ("[S]uspension or delayed implementation of a final regulation normally constitutes substantive rulemaking under APA § 553."); NRDC v. EPA , 683 F.2d 752, 761-62 (3d Cir. 1982) (holding that indefinite delay of an effective date was a "rule" for purposes of APA).
NHTSA does not appear to dispute that the Suspension Rule constitutes a final rule that would be subject to the notice and comment requirements of APA § 553. Instead, it invokes the APA's "good cause" exception to notice and comment rulemaking. Under that exception, an agency may forgo notice and comment when it "for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).
When reviewing an agency's claim of good cause, which we do de novo, Sorenson Comm., Inc. v. FCC , 755 F.3d 702, 706 (D.C. Cir. 2014), we must "examine closely" the agency's explanation as outlined in the rule, Council of S. Mountains, Inc. v. Donovan , 653 F.2d 573, 580 (D.C. Cir. 1981). The burden is on the agency to establish that notice and comment *114 need not be provided. Action on Smoking & Health v. Civil Aeronautics Bd. , 713 F.2d 795, 801 n.6 (D.C. Cir. 1983). The good cause exception "should be narrowly construed and only reluctantly countenanced." Abraham , 355 F.3d at 204 ; see also Mack Trucks, Inc. v. EPA , 682 F.3d 87, 93 (D.C. Cir. 2012). It is generally limited to "emergency situations, or where delay could result in serious harm." Jifry v. FAA , 370 F.3d 1174, 1179 (D.C. Cir. 2004) (internal citation omitted). When, as here, the agency argues that its action is in the "public interest," a court will only agree "in the rare circumstance when ordinary procedures-generally presumed to serve the public interest-would in fact harm that interest." Mack Trucks , 682 F.3d at 95.
As noted, the good cause exception applies only in circumstances when notice and comment is "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). Impracticality is fact and context specific, but is generally confined to emergency situations in which a rule would respond to an immediate threat to safety, such as to air travel, or when immediate implementation of a rule might directly impact public safety. Mack Trucks , 682 F.3d at 93 (collecting cases). The exception may also be invoked when notice and comment are "unnecessary." This prong "is confined to those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry to and to the public." Id. at 94 (quotation omitted). And, finally, an agency may invoke the good cause exception if notice and comment would be "contrary to the public interest." Of course, since notice and comment are regarded as beneficial to the public interest, for the exception to apply, the use of notice and comment must actually harm the public interest. Id. at 94-95.[13]
We conclude that NHTSA's action does not meet these exacting standards. NHTSA offers several reasons why it believes it is entitled to invoke the exception. NHTSA first argues that notice and comment was not provided because, as it stated in the Federal Register, the effective date of the Civil Penalties Rule was "imminent." 82 Fed. Reg. at 32140 (Suspension Rule) ; Joint App'x at 78. And, NHTSA stated that no party was harmed by the delay because the Civil Penalty Rule did not affect cars until model year 2019 and thus did not apply to current violations. NHTSA also contended that, in a contemporaneous notice, it solicited public comments on the underlying issues, and consequently needed time to consider those comments. Id. These rationales are not sufficient to invoke the good cause exception.
Any imminence was NHTSA's own creation. NHTSA promulgated the Civil Penalties Rule on December 28, 2016, and NHTSA subsequently delayed its implementation of the rule through a trio of successive delays of finite durations. The effective date of the Civil Penalties Rule was imminent only insofar as NHTSA's third finite delay was scheduled to elapse. Good cause cannot arise as a result of the agency's own delay, because "[o]therwise, an agency unwilling to provide notice or an *115 opportunity to comment could simply wait until the eve of a statutory, judicial, or administrative deadline, then raise up the 'good cause' banner and promulgate rules without following APA procedures." Council of S. Mountains , 653 F.2d at 581. Quite simply, "[w]e cannot agree ... that an emergency of [the agency's] own making can constitute good cause." Abraham , 355 F.3d at 205.
Second, NHTSA argues that that no party was harmed by the delay because the Civil Penalty Rule did not take effect until the 2019 model year, and, as such, did not apply to current violations. This contention does not establish good cause for the simple reason that it does not meet the statutory requirement that notice and comment cannot be dispensed with unless doing so would be "impracticable, unnecessary, or contrary to the public interest."
Next, NHTSA notes that, simultaneously with the Suspension Rule, it published a rule soliciting comments concerning the appropriate penalty and contends that it was entitled to dispense with notice and comment in promulgating the Suspension Rule because it needed time to consider the responses it anticipated receiving. This rationale fares no better. It does not satisfy the "unnecessary" prong because that prong is limited to circumstances when the rule is "inconsequential to the industry and to the public," Mack Trucks , 682 F.3d at 94. The responses of both sides on this petition unquestionably indicate that the Suspension Rule is anything but inconsequential.
Nor may NHTSA argue that notice and comment would not have been meaningful, or that comments would necessarily have addressed the issue it contemporaneously solicited comments on regarding whether to raise the penalty. An agency may not promulgate a rule suspending a final rule and then claim that post-promulgation notice and comment procedures cure the failure to follow, in the first instance, the procedures required by the APA. NRDC v. EPA , 683 F.2d at 768.
Finally, it was not in the public interest to suspend notice and comment. Notice and comment are not mere formalities. They are basic to our system of administrative law. They serve the public interest by providing a forum for the robust debate of competing and frequently complicated policy considerations having far-reaching implications and, in so doing, foster reasoned decisionmaking. These premises apply with full force to this case. This is not a situation of acute health or safety risk requiring immediate administrative action. And it is not a situation in which surprise to the industry is required to preempt manipulative tactics.
That a regulated entity might prefer different regulations that are easier or less costly to comply with does not justify dispensing with notice and comment. Mack Trucks , 682 F.3d at 94. The automobile industry was on notice since 2015, long before the Civil Penalties Rule was promulgated in December 2016, that Congress had established a regime requiring agencies across the federal government to institute mandatory, inflation-linked increases to numerous federal civil penalties, including the CAFE penalties and we are unconvinced the industry was taken by surprise. There was not an emergency or other extraordinary circumstance that would justify forgoing notice and comment.
Accordingly, NHTSA violated the APA in promulgating the Suspension Rule without undertaking notice and comment rulemaking.
CONCLUSION
For the foregoing reasons, we GRANT the petitions for review and VACATE the *116 Suspension Rule, 82 Fed. Reg. 32,139, 32,139 -40 (July 12, 2017). The Civil Penalties Rule, 81 Fed. Reg. 95,489, 95,489 -92 (December 28, 2016), no longer suspended, is now in force.

In 2007, Congress amended this section of EPCA to permit manufacturers to trade credits. See Energy Independence and Security Act of 2007, Pub. L. No. 110-410, § 104(a), 121 Stat. 1492, 1501-03 (2007) (codified at 49 U.S.C. § 32903(f) ).

NHTSA's two main arguments in response do not persuade us to read Section 32909 any differently. NHTSA first notes that it has long distinguished between a date a regulation is "prescribed" and the date of its publication in the Federal Register. As NHTSA appears to acknowledge, it is owed no deference in its interpretation of Section 32909. Interpretation of a judicial review provision is a judicial inquiry, not an administrative one, so an agency's view on such a provision is owed no deference. See Adams Fruit Co., Inc. v. Barrett , 494 U.S. 638, 649-50, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990).
NHTSA's second argument depends on Pub. Citizen, Inc. v. Mineta , 343 F.3d 1159, 1165-68 (9th Cir. 2003), in which the Ninth Circuit, noting NHTSA was not entitled to deference on its interpretation of the provision, treated the word "issued" in a different statute, the Federal Motor Vehicle Safety Standards, as distinct from publication in the Federal Register, reasoning that the notions of notice in the word "issue" referred to when the agency made the regulation available for public inspection. That case is inapposite, because it interpreted a different word involving a different concept in a different statute. We do not believe, therefore, that it is useful in shaping our understanding of when a regulation has been "prescribed" under EPCA.

The Suspension Rule, as a "substantive rule[ ] of general applicability" was required to be published in the Federal Register. 5 U.S.C. § 552(a)(1)(D). Agency "rules of procedure" are required to be published in the Federal Register, too. Id. § 552(a)(1)(C). Although NHTSA now argues that the Suspension Rule is a rule of procedure, publication in the Federal Register would still be required.

A clear statement that the rule is jurisdictional is still required "even when the time limit is important ... and even when it is framed in mandatory terms ... ; indeed, that is so however emphatically expressed those terms may be." Kwai Fun Wong , 135 S.Ct. at 1632 (quotation marks and brackets omitted). "[S]tatute[s] of limitations that can deprive a court of jurisdiction" are "rare." Id. And, simply because a filing deadline is contained in or near Section 32909 's grant of jurisdiction upon the court of appeals does not mean that the filing deadline requirement is jurisdictional. Instead, a requirement such as a filing deadline that we "would otherwise classify as nonjurisdictional ... does not become jurisdictional simply because it is placed in a section of a statute that also contains jurisdictional provisions." Auburn Regional , 568 U.S. at 155, 133 S.Ct. 817.

Though NHTSA argues in its brief that the rule was "merely an interim procedural step" rather than a "substantive or legislative rule," Respondent Br. at 39, NHTSA does not explicitly argue that the delay was not a "final rule" for purposes of our review under 5 U.S.C. §§ 704 and 706. Nor can it plausibly do so; NHTSA itself labeled the rule a "Final Rule" in the Federal Register notice. 82 Fed. Reg. at 32,139. In any event, it is well settled that "an order delaying the rule's effective date ... [is] tantamount to amending or revoking a rule." Clean Air Council v. Pruitt , 862 F.3d 1, 6 (D.C. Cir. 2017).

NHTSA argues in part that its authority to indefinitely delay the rule stemmed from its authority to implement EPCA. See discussion infra Section I.C.2.

See id . § 4(c) (Exception.-For the first adjustment made under subsection (a) after the date of enactment of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, the head of an agency may adjust the amount of a civil monetary penalty by less than the otherwise required amount if-(1) the head of the agency, after publishing a notice of proposed rulemaking and providing an opportunity for comment, determines in a final rule that-(A) increasing the civil monetary penalty by the otherwise required amount will have a negative economic impact; or (B) the social costs of increasing the civil monetary penalty by the otherwise required amount outweigh the benefits; and (2) the Director of the Office of Management and Budget concurs with the determination of the head of the agency under paragraph (1).).

In reporting favorably upon the bill, the Committee on Government Operations observed that "[a]lthough this bill would not provide for any adjustment of the amounts of civil penalties, it would permit, for the first time, comprehensive review of all civil monetary penalties to evaluate both the need for inflation adjustment and the usage of each penalty in Federal regulatory programs. Under the bill, the Administration would provide to Congress a report identifying all civil monetary penalties, and the amount by which each penalty would be increased were its relative value matched to those of goods and services considered in the Consumer Price Index."H.R. Rep. No. 101-697, at 1-2 (1990). The Report further observed that "[t]he data which would be required under the report provisions of [the bill] would mark the first time such data would be centrally collected and maintained on all Federal regulatory programs." Id . at 3.

In the notice of the 2016 increase, NHTSA explained that the rounding methodology included in the 1990 Inflation Adjustment Act had the practical effect of causing "penalties to lose value relative to total inflation." 81 Fed. Reg. at 43525. See also Inflation Adjustment Act § 5.

NHTSA does not argue that we owe its interpretation of EPCA any deference, nor could it, because it has not identified a section of EPCA that presents any relevant ambiguity on the question of its statutory authority to publish the Suspension Rule. See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc. , 467 U.S. 837, 842-43 n.9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). And deference is clearly not warranted under the Improvements Act. The language is unambiguous, id ., and the Act applies to all federal agencies, meaning NHTSA has no special expertise in interpreting its language, cf. id . at 842, 104 S.Ct. 2778.

In 1990, the Committee Report on the Inflation Adjustment Act emphasized the government-wide approach to the initial bill, by explaining that the intention of the committee was for data collection to be "undertaken in a uniform and consistent manner throughout the Federal Government" with the goal of enabling "a comprehensive review of the current system of civil penalties." H.R. Rep. No. 101-697, at 4 (1990).

In holding thus, we observe that the Improvements Act is an unusually precise and directive statute. The Act mandates that all agencies increase penalties by a date certain with no suggestion of delay. The text of the statute provides no discretion to the agencies regarding the timing of adjustments. The statutory purpose and legislative history confirm our inflexible reading of the statute. The power of an agency to use its administrative discretion is always cabined by the original grant of authority through statute. The Improvements Act gave no such grant regarding the timing of the penalty increases, and it was therefore unlawful for NHTSA to assume authority it did not possess.

As an example, a recognized permissible use of the "good cause" exception under the "public interest" prong is when the notice provided by notice and comment would enable manipulation, such as in price control situations in which surprise to the parties is necessary-meaning, in general, when "announcement of a proposed rule would enable the sort of financial manipulation that the rule sought to prevent." Util. Solid Waste Activities Grp. v. EPA , 236 F.3d 749, 755 (D.C. Cir. 2001).